# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39556**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Jacob M. OZBIRN**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 1 MAY 2020

————————————

*Military Judge:* John C. Harwood.

*Approved sentence:* Dishonorable discharge, confinement for 3 years, and reduction to E-1. Sentence adjudged 11 May 2018 by GCM convened at Royal Air Force Mildenhall, United Kingdom.

*For Appellant:* Captain David A. Schiavone, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Anne M. Delmare, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Chief Judge J. JOHNSON delivered the opinion of the court, in which Judge POSCH joined. Judge KEY filed a separate opinion concurring in part and dissenting in part.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

J. JOHNSON, Chief Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of two specifications of attempted sexual abuse of a

child, one specification of attempted sexual assault of a child, and one specification of attempted receipt of child pornography, all in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1,2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for three years, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises eight issues on appeal: (1) whether the evidence was legally and factually sufficient to support his conviction; (2) whether the military judge erred by failing to dismiss the specification alleging attempted receipt of child pornography for unreasonable multiplication of charges; (3) whether the specification alleging attempted sexual assault of a child failed to state an offense by failing to allege Appellant committed a requisite overt act; (4) whether the military judge erred by identifying such overt acts in his instructions to the members; (5) whether the military judge erred by instructing the members they could use Appellant's uncharged acts with respect to one purported child as evidence of his intent to sexually assault another purported child; (6) whether the military judge erred by incorrectly instructing the members on the maximum sentence and by failing to instruct them on the nature and effect of the mandatory dishonorable discharge; (7) whether the Government's failure to disclose a witness's arrest history warrants setting aside Appellant's convictions for two of the specifications or, alternatively, warrants a post-trial fact-finding hearing; and (8) whether he is entitled to relief for unreasonable post-trial and appellate delay. In addition, although not raised by Appellant, we address an error in the staff judge advocate's recommendation to the convening authority (SJAR).

We set aside the language in Specifications 1 and 2 that Appellant committed the alleged attempted sexual abuse of a child "on divers occasions" as legally insufficient. Having accordingly reassessed the sentence, and having found no other substantial error that materially prejudiced Appellant's rights, we affirm the remaining findings and the sentence.

---

[1] All references in this opinion to the Uniform Code of Military Justice (UCMJ), Military Rules of Evidence (Mil. R. Evid.), and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] The members found Appellant not guilty of a third specification of attempted sexual abuse of a child. In total, Appellant was tried for one charge and five specifications of violating Article 80, UCMJ.

## I. BACKGROUND

Appellant was stationed at and lived on Royal Air Force (RAF) Mildenhall in the United Kingdom. Over an approximately 48-hour period in August 2017, Appellant used messaging applications on his phone to exchange messages with three individuals who held themselves out to be a 12-year-old girl named "Febes," a 13-year-old girl named "Jodie Walsh," and a 12-year-old girl named "Jessica Saunders." Despite being put clearly on notice of their purported ages, Appellant engaged all three in sexually explicit conversations in which he discussed sexual conduct he wanted to engage in with them. He asked all three to send him naked pictures of themselves and made arrangements to meet two of the "girls" for purposes of having sexual intercourse with them. These arrangements included meeting "Febes" at 1930 hours on 18 August 2017 on a road next to a hotel in Burton-on-Trent, and then meeting "Jodie" in a different town shortly after midnight that same night. Appellant then drove to the Burton-on-Trent hotel, about two and a half hours away from RAF Mildenhall, to meet "Febes."

The three "girls," however, did not actually exist. Rather, they were personas created and assumed by three different adult British citizens working with two groups organized for the purpose of identifying people with a propensity for engaging in inappropriate online conversations with children. The adult behind the "Febes" persona was Mr. GW, and the "Jessica" persona was Mr. JG, both members of the group "Keeping Kids Safe" (KKS). The "Jodie" persona was Ms. LM, a member of the group "Silent Justice." The modus operandi of the two groups was to create "decoy" child personas, deploy them on messaging and social media platforms, and then wait for adult users to engage with them. Once an adult user started having sexualized conversations with a decoy child persona, the group would investigate that user to determine identifying information, such as phone numbers, home addresses, social media accounts, and the like. The group would use the decoy persona to attempt to arrange an in-person meeting with the user. If that meeting failed, the members would go to the user's house and try to engage the user in person. Operating under aliases, the groups would livestream meetings with such users while seeking to obtain incriminating admissions, only calling law enforcement authorities after first making positive contact with their targets. The groups were not supported, endorsed, or approved by any government entity, to include British law enforcement.

When Appellant arrived in Burton-on-Trent, he drove down the narrow road where he had arranged to meet "Febes." Once there, he was blocked in by six members of KKS, to include Mr. GW and Mr. JG. They surrounded Appellant, took his keys and phone, and attempted to interrogate him for approximately 45 minutes while waiting for the local police to arrive, recording

and livestreaming the entire episode over Facebook. Once the police arrived, the KKS members gave the police Appellant's cell phone, and Appellant was taken into custody, derailing any later plans to meet up with "Jodie."

Based upon these events, Appellant was charged with three specifications of attempted sexual abuse of a child—one specification for each decoy. Each of these three specifications alleged Appellant attempted to commit a lewd act by communicating indecent language to a child under the age of 16 years "on divers occasions," and each consisted of a lengthy catalog of messages sent by Appellant to each decoy. Appellant was also charged with a specification of attempted sexual assault of a child based upon his traveling to Burton-on-Trent to meet "Febes." Finally, Appellant was charged with attempted receipt of child pornography on divers occasions for asking the three decoys to send him naked pictures of themselves.

The court members acquitted Appellant of the specification alleging attempted sexual abuse of a child with respect to "Jessica Saunders." In addition, the members purported to except the words "Jessica Saunders" from the attempted receipt of child pornography specification, despite the fact that such words were not actually in the specification. The court members convicted Appellant of the remaining specifications.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

#### 1. Additional Background

##### a. Attempted Sexual Abuse and Attempted Sexual Assault

The evidence against Appellant included testimony by the three adults who posed as young girls: Mr. GW, Mr. JG, and Ms. LM. Each testified regarding the messages they exchanged with Appellant using two different messaging applications, Nearby and WhatsApp.[3] Photographs (screenshots) of the messages on all three decoy operators' phones were admitted into evidence. In the messages, Appellant sent a picture of himself to Mr. GW (portraying "Febes") and Ms. LM (portraying "Jodie"), and stated he was 20 years

---

[3] The decoys started their conversations on Nearby but would try to move to WhatsApp because the latter application provided more detailed user information. Mr. GW and Ms. LM used both applications to message with Appellant. Mr. JG (who portrayed "Jessica") did not try to shift his conversation with Appellant to WhatsApp because he had determined his colleague, Mr. GW, was already arranging an in-person meeting with Appellant.

old, was from RAF Mildenhall, and drove a silver Volvo. The WhatsApp screenshots from "Febes's" and "Jodie's" phones show Appellant's cell phone number, and Appellant's avatar on Nearby was a picture of himself. Appellant's messages to all three decoys were similar—assuring each that she was the "right age" to learn about sex, that Appellant was willing to teach her, and she could learn by having sexual intercourse with him.

In his messages with "Febes," Appellant said he would get a room at the hotel in Burton-on-Trent, where they could have sex. Shortly thereafter, Appellant told her there were no rooms available, so they would "have to use the car or another place." They then agreed to meet down a road alongside the hotel. At trial, Mr. GW and Mr. JG testified about confronting Appellant when he drove down that road in a silver left-hand-drive Volvo. Earlier in the day, around noon, Appellant told "Jodie" he was at a "work party," but that he would not be getting drunk because he had "to drive."

A computer forensics analyst testified he analyzed Appellant's phone, and evidence extracted from it confirmed Appellant had, in fact, called the hotel, as well as the number of a neighboring hotel at the same time he was making arrangements with "Febes." The analyst also found Internet searches in which Appellant seemed to be trying to determine whether the people he was messaging were in fact who they claimed to be.[4]

The analyst extracted messages Appellant sent to and received from "Febes" and "Jodie" via WhatsApp (Appellant communicated with "Jessica" only on Nearby), but he was unable to retrieve any messages associated with Nearby from Appellant's phone. The WhatsApp messages taken from Appellant's phone are nearly identical to the screenshots of "Febes's" and "Jodie's" phones, although a few of the messages are in a slightly different order in the analyst's extraction than they appear in the screenshots.

In addition to the ordering of the messages, trial defense counsel argued the members should be skeptical of the prosecution exhibits consisting of screenshots of the various messages due to the times shown in those screenshots. One of the Air Force Office of Special Investigations (AFOSI) special agents involved in the case had testified that, around 31 August 2017, he and a second agent went back to the British police station which originally took custody of Appellant. On one day of that trip, the first agent took screenshots of the Nearby messages with "Jessica" on Mr. JG's phone, with the screen-

---

[4] For example, the searches included "what year would a 13 year old go to school in England" and "when does year 9 start in England" ("Jodie" said she was 13 years old and was about to start Year 9 in school).

shots showing they were taken shortly after 1130 hours. He also took screen-shots of Appellant's Nearby messages with "Febes" on Mr. GW's phone, which indicated a cell phone time of just after 1300 hours. On a different day on the same trip, one of the agents took screenshots of the Nearby and WhatsApp messages with "Jodie" on Ms. LM's phone; the screenshots showed times of approximately 1830 hours and 1840 hours, respectively.

### b. Attempted Receipt of Child Pornography

Appellant asked "Febes," "Jodie," and "Jessica" for naked pictures. With respect to his communications with "Febes," Appellant engaged in the following exchanges:

> [Appellant:]   have you seen naked guys or every [sic] sent na-ked pictures? . . .
>
> ["Febes":]     never seen no
>
> [Appellant:]   Oh I could show you if you want and I would like to see you too
>
> ["Febes":]     I don't have a camera
>
> . . . .
>
> [Appellant:]   There is nothing to be afraid of I will take care of you! And please can I have on[e] more picture
>
> ["Febes":]     U can take tom[orrow]
>
> ["Febes":]     With ur phone
>
> ["Febes":]     We can do selfy
>
> [Appellant:]   Can I take naked ones?
>
> ["Febes":]     I'm very shy
>
> [Appellant:]   We are having sex tomorrow and only I will see them
>
> ["Febes":]     Kk
>
> ["Febes":]     If u promise
>
> [Appellant:]   I do

Appellant made a similar request of "Jodie":

> [Appellant:]   Have you ever sent a naked picture to anyone or seen a guys part?
>
> ["Jodie":]     No
>
> . . . .

6

[Appellant:] Can you send me a naked picture?

["Jodie":] No I can't do that

[Appellant:] Why?

[Appellant:] It will help

. . . .

["Jodie":] I'm not sending naked pictures of me

[Appellant:] I mean any pictures

["Jodie":] Oh ok

["Jodie":] [Sends clothed photo of head and shoulders]

[Appellant:] Yeah I was hoping the naked one would help but any will do

Finally, Appellant had the following exchange with "Jessica":

[Appellant:] have you ever traded naked pictures before?

["Jessica":] no one has seen me naked

[Appellant:] do you want to see a d*ck so that you will know what goes in?

["Jessica":] ok

[Appellant:] So you have to send a picture of you naked then you get to see a d*ck

["Jessica":] I haven't got any naked photos

[Appellant:] you have to take one

["Jessica":] I can't my sister is sleeping and my camera is broke

### 2. Law

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict."

7

*United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

In order to find Appellant guilty of an attempt, the court members were required to find the following four elements proven beyond a reasonable doubt: (1) that Appellant did a certain overt act; (2) that the act was done with the specific intent to commit a certain offense under the code; (3) that the act amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b.

The elements for sexual abuse of a child by indecent communication, as charged here, required the Government to prove beyond a reasonable doubt: (1) Appellant intentionally communicated indecent language to a child under the age of 16 years; and (2) he did so with the intent to gratify his sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(d).

The elements of sexual assault of a child in this case required proof beyond a reasonable doubt that: (1) Appellant committed a sexual act upon a child causing penetration of her vulva with his penis; and (2) at the time of the sexual act, the child had attained the age of 12 years but had not attained the age of 16 years. *See MCM*, pt. IV, ¶ 45b.b.(3)(a).

The elements of receipt of child pornography in this case included: (1) Appellant knowingly and wrongfully received child pornography; and (2) that under the circumstances, Appellant's conduct was to the prejudice of good or-

der and discipline in the armed forces and of a nature to bring discredit upon the armed forces. *See MCM*, pt. IV, ¶ 68b.b.(1). "Child pornography" is defined as "material that contains either an obscene visual depiction of a minor engaging in sexually explicit conduct or a visual depiction of an actual minor engaging in sexually explicit conduct." *See MCM, pt. IV, ¶* 68b.c.(1). Because Appellant was charged with attempting to receive pictures of "what appear to be minors" rather than actual minors, the Government had to prove that the pictures were obscene in addition to depicting a minor engaging in sexually explicit conduct. *See, e.g., United States v. Stanton*, No. ACM 38385, 2014 CCA LEXIS 650, at *9 (A.F. Ct. Crim. App. 28 Aug. 2014) (unpub. op.). "Sexually explicit conduct" is defined as actual or simulated sexual intercourse, sodomy, bestiality, masturbation, sadistic or masochistic abuse, or the "lascivious exhibition of the genitals or pubic area of any person." *MCM*, pt. IV, ¶ 68b.c.(7). More than mere nudity is required to prove an image amounts to a "lascivious exhibition." *United States v. Piolunek*, 72 M.J. 830, 836 (A.F. Ct. Crim. App. 2015) (citation omitted), *aff'd*, 74 M.J. 107 (C.A.A.F. 2015). Whether an image constitutes a "lascivious exhibition" ultimately depends on the totality of the circumstances. *See United States v. Roderick*, 62 M.J. 425, 430 (C.A.A.F. 2006) (citations omitted).[5]

### 3. Analysis

Appellant argues the evidence is legally and factually insufficient to support any of the specifications for which he was convicted. We consider each offense in turn.

---

[5] Military courts use the so-called *Dost* factors in conjunction with the totality of the circumstances to determine whether an exhibition of the genitals or pubic area is lascivious. *Piolunek*, 74 M.J. at 109 (citation omitted); *see also Roderick*, 62 M.J. at 429 (citing *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987)). The *Dost* factors are:

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area; (2) whether the setting of the visual depiction is sexually suggestive, i.e. in a place or pose generally associated with sexual activity; (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Roderick*, 62 M.J. at 429 (quoting *Dost*, 636 F. Supp. at 832).

### a. Attempted Sexual Abuse of a Child

### i. Strength of the Evidence

Appellant argues the evidence of the messages he sent "Febes" and "Jodie" is "not forensically sound." He points to alleged evidentiary inconsistencies such as the differences in time shown on pictures taken by the AFOSI agents of the cell phone screens, which he asserts contradicted the agents' testimony as to the time they spent taking the pictures. In addition, he contends the fact that different exhibits depicting the same messages do not appear exactly the same vitiates their reliability. We are not persuaded.

The screenshots of the Nearby messages with "Febes" show a time around 1300, while the "Jodie" WhatsApp messages show a time after 1830 hours. However, on cross-examination the first agent testified that he did not spend five and a half hours taking screenshots of the various phones. Therefore, as at trial, on appeal Appellant argues the screenshots are "not forensically sound" and are "internally inconsistent." However, Appellant's contention is undermined by the fact the screenshots were taken on two different days. That is, the screenshots showing midday times were taken one day, while the screenshots showing evening times were taken another day, which explains the AFOSI agent's testimony. On this point, Appellant has simply misapprehended the evidence adduced at trial.

Similarly, we are not persuaded by Appellant's suggestion the Government's evidence of the messages is "inconsistent" due to a small number of them appearing in a different order in the forensic extraction when compared to the screenshots. Mr. GW and Ms. LM testified that the screenshots admitted into evidence were accurate copies of the messages they sent to and received from Appellant. Neither of the witnesses was impeached in any significant way, and no evidence was offered indicating either of them attempted to modify the messages in order to deceive investigators or for any other reason. Despite Appellant's argument, the vast majority of messages in the screenshots are identical to—and in the same order as—those extracted from his phone, which sharply minimizes the evidentiary significance of a few messages appearing slightly out of order. We are not persuaded these minor differences render the entire body of the messages unreliable.

The evidence showing that Appellant sent the messages to "Febes" and "Jodie" underpinning his conviction for attempted sexual abuse is strong. The screenshots taken from the witnesses' phones directly correspond with the evidence extracted from Appellant's own phone. Appellant used a photograph of himself as his avatar on the Nearby application, which was visible from the decoys' side of the messages, as was his name, Jacob Ozbirn. Appellant sent a picture of himself and explained that he was from RAF Mildenhall and drove

a silver Volvo. Most compellingly, Appellant arranged to meet "Febes" at a particular place in Burton-on-Trent at a particular time on a particular day in the messages he exchanged with her, and then he arrived at that place, at that time, on that day, driving his silver Volvo. We see no serious challenge to the evidence that Appellant sent the charged messages.

Similarly, the evidence demonstrates Appellant believed "Febes" and "Jodie" were the young girls they consistently held themselves out to be. The first message Appellant sent "Febes" asked, "How old are you?" "Febes" responded, "I'm 12." Appellant's first message to "Jodie" was "How are you?" She responded, "gd thx I'm Jodie 13 from Birmingham wbu." Throughout their conversations, "Febes" and "Jodie" reminded Appellant of their ages and frequently referred to facets of childhood, such as being in school, not being allowed to have boyfriends, needing to evade parents to meet with Appellant, and so on. At no time did Appellant indicate that he thought he was exchanging messages with an adult rather than a 12-year-old and a 13-year-old girl.

The indecency of the messages is readily apparent. Appellant detailed not just that he wanted to engage in sexual activity with the girls, but also how he would do it, explaining vaginal and oral acts using terms and comparisons a child would understand. He explained to the girls they were at the right age to learn to have sex, expressed his desire to teach them, assured them they would not get pregnant, and asked them to send him naked pictures of themselves. The fact Appellant detailed the sexual acts he wished to perform with the girls in conjunction with his arranging to meet them for the purpose of having sex is very strong evidence that Appellant's intent in sending the messages was to gratify his sexual desire. Because "Febes" and "Jodie" were not actually children, Appellant could not be convicted of sexually abusing children. He could, however, be convicted of attempting to do so.

### ii. *"Divers Occasions"*

Appellant argues the two specifications of attempted sexual abuse of a child "on divers occasions" are legally insufficient in that there is no evidence either offense was committed on more than one occasion. We agree with Appellant that the "on divers occasions" language is legally insufficient.

"Divers" means "two or more." *See, e.g., United States v. Neblock*, 45 M.J. 191, 199 n.10 (C.A.A.F. 1996) (citation omitted). As noted above, these specifications are arranged by decoy (i.e., one specification pertains to "Febes" and the other pertains to "Jodie Walsh"). Each specification contains a lengthy list of the messages Appellant sent to the decoys. Although the evidence shows Appellant sent these messages, there is no evidence that Appellant sent these specific messages to the respective decoy more than once. Appel-

lant did send his messages at different times over a period of about two days, but there is no evidence he sent any of the messages two or more times.

The Government argues the "divers occasions" language is meant to capture the fact Appellant sent messages at different times. "Divers occasions," however, means an accused has committed an offense two or more times, not that a single offense was perpetrated over a period of time. *See id.* When the Government elects to charge an offense alleging the use of specific words, it stands to reason that a charge of "divers occasions" is legally insufficient unless Appellant repeats those particular words on two or more occasions. To hold otherwise exaggerates Appellant's criminality by portraying him as having committed the offenses in these two specifications multiple times, when he only committed them once. We take corrective action in our decretal paragraph below.

### iii. Conclusion as to Attempted Sexual Abuse of a Child

With the exception of the words "on divers occasions" in each of the sexual abuse specifications, we conclude a rational trier of fact could find all the elements of the offense of attempted sexual abuse of a child with respect to both "Febes" and "Jodie." Having taken a fresh and impartial look at the evidence, we are also satisfied of Appellant's guilt beyond a reasonable doubt.

### b. Attempted Sexual Assault of a Child

With respect to attempted sexual assault, Appellant argues the Government never proved a substantial step occurred "at or near [RAF] Mildenhall," as charged. Rather, Appellant argues he drove to Burton-on-Trent, which was approximately two and a half hours away from RAF Mildenhall. He contends no rational trier of fact could find he took a substantial step towards committing the offense "at or near" RAF Mildenhall. We disagree.

We first note Appellant has not cited any legal authority for the proposition that a place being two and a half hours away from that which is described as "at or near" in the specification renders the specification infirm. More significantly, the evidence indicates Appellant lived and worked on RAF Mildenhall and attended a work party before driving to meet "Febes" later that day. Although there is no direct evidence that Appellant was on the base when he was sending messages to the girls, the fact Appellant lived and worked on RAF Mildenhall is solid circumstantial evidence that Appellant's offenses originated at the base. The same circumstantial evidence supports the conclusion that Appellant drove directly from RAF Mildenhall to Burton-on-Trent in order to carry out the sexual assault he had arranged with "Febes." Put differently, the evidence indicates Appellant's overt acts did not just begin "at or near" RAF Mildenhall—they began *on* RAF Mildenhall. Even if we were to find Appellant's offenses originated and were carried out

off-base, we conclude that "at or near Royal Air Force Mildenhall" is sufficiently broad to include the act of driving from the vicinity of RAF Mildenhall to Burton-on-Trent and to put Appellant on notice of the charge he had to defend against. *See United States v. Gallo*, 53 M.J. 556, 564 (A.F. Ct. Crim. App. 200), *aff'd*, 55 M.J. 418 (C.A.A.F. 2001) ("If a specification informs an accused of the offense against which he or she must defend and bars a future prosecution for the same offense, the specification is sufficient.") (citations omitted).

Appellant not only arranged to meet with "Febes" for the stated purpose of engaging in sexual intercourse with a 12-year-old girl; he drove to Burton-on-Trent to meet her, which is a substantial step towards committing the offense of sexual assault of a child. The chief obstacle to Appellant's commission of the offense was that "Febes" was not actually a child. We conclude a rational trier of fact could find all the essential elements of the offense of attempted sexual assault of a child with respect to "Febes." Having taken a fresh and impartial look at the evidence, we are also satisfied of Appellant's guilt beyond a reasonable doubt.

### c. Attempted Receipt of Child Pornography

Finally, Appellant argues his conviction for attempted receipt of child pornography cannot stand due to the absence of evidence he actually sought child pornography from the personas he was messaging. Again, we disagree.

The elements of the offense Appellant attempted to commit, receipt of child pornography in violation of Article 134, UCMJ, 10 U.S.C. § 934, include: (1) receipt of child pornography that is knowing and wrongful; and (2) that under the circumstances Appellant's conduct was prejudicial to good order and discipline and service discrediting. The court members could easily conclude Appellant's attempted receipt of child pornography, if completed, would have met these elements. Appellant repeatedly solicited naked photographs from what he believed to be a 12- and 13-year-old British girls in the context of attempting to initiate sexual relationships with them. There is little question that, had he received such images, his conduct would have been knowing and wrongful. Moreover, Appellant's actions, in addition to being service-discrediting by virtue of his status as an Airman, directly resulted in his identification, public apprehension, and arrest, first by British citizens acting as vigilantes and then by British police.

As for the elements of attempt, we find the court members could readily conclude Appellant's direct and repeated solicitations for naked pictures were overt acts that went beyond mere preparation and tended to effect the commission of the offense of receipt of child pornography. Therefore, the Government proved the first, third, and fourth elements of attempt.

Appellant argues the evidence is insufficient with regard to the remaining element: that he had the specific intent to commit the offense of receipt of child pornography. We agree with Appellant that, as charged in this case, the evidence must support a finding that Appellant intended to receive "an obscene visual depiction of a minor engaging in sexually explicit conduct," a definition that includes, *inter alia*, a "lascivious exhibition of the genitals or pubic area of any person." We disagree with Appellant's assertion that there is "no evidence" of such an intent.

"[T]he government is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted); *see also* Rule for Courts-Martial (R.C.M.) 918(c) ("Findings may be based on direct or circumstantial evidence."); *United States v. Davis*, 49 M.J. 79, 83 (C.A.A.F. 1998) (holding intent to commit offense may be proven by circumstantial evidence) (citation omitted). Therefore, the Government was not required to introduce a specific statement by Appellant that he desired a lascivious display of "Febes's" or "Jodie's" genitals or pubic areas, or any other specific words. Circumstantial evidence demonstrating his intent beyond a reasonable doubt could be sufficient.

In this case, the Government did introduce strong circumstantial evidence of Appellant's intent. The entire focus of Appellant's communications with the fictional personas was sexual. Appellant encouraged the "girls" to engage in sexual activity, and specifically to engage in sexual activity with him. Appellant's messages referred explicitly to acts he intended to perform on their genitals. In that context, he specifically requested naked images of the "girls." Moreover, he requested to take naked pictures of "Febes" when he met her in person to engage in sexual intercourse. We find it more than reasonable to conclude that any naked photographs of "Febes" under those circumstances that included her genitals or pubic region would constitute a "lascivious display," and therefore "sexually explicit conduct."[6]

Appellant's exchanges with "Jessica" are also revealing with regard to the nature of the "naked pictures" in which he was interested. Appellant encouraged "Jessica" to "trade" him a "naked picture" of herself in exchange for a picture of a penis, stating "you have to send a picture of you naked then you

---

[6] "Lascivious" means "[t]ending to incite lust," "lewd," "obscene," "licentious," or "tending to deprave the morals with respect to sexual relations." *Lascivious*, BLACK'S LAW DICTIONARY (6th ed. 1990). We find the *Dost* factors to be of limited utility in this case because there are no actual images to evaluate—nor, or course, were any such images required in order for Appellant to be found guilty of an attempt. *See generally Roderick*, 62 M.J. at 429.

get to see a d\*ck."[7] However, even without Appellant's messages to "Jessica," we conclude a reasonable finder of fact could find proof beyond a reasonable doubt that Appellant intended to receive child pornography.

Drawing every reasonable inference from the evidence of record in favor of the Government, the evidence was legally sufficient to support Appellant's conviction of attempted receipt of child pornography beyond a reasonable doubt. Additionally, having weighed the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.

## B. Unreasonable Multiplication of Charges

### 1. Additional Background

Specifications 1, 2, and 3 of the Charge alleged Appellant attempted to commit a "lewd act" upon "Febes," "Jodie Walsh," and "Jessica Saunders," respectively, by intentionally communicating indecent language with the intent to gratify his sexual desire between on or about 16 August 2017 and on or about 18 August 2017.[8] Each specification included a lengthy recitation of

---

[7] We recognize the court members purported to except the words "Jessica Saunders" from their finding that Appellant was guilty of attempted receipt of child pornography. However, we make two observations in this regard. First, the members' purported exception was without legal effect, because the words "Jessica Saunders" did not appear in the specification to be excepted from it, and because court members render only general findings of guilt and, unlike military judges, cannot make special findings. *See* R.C.M. 918(a), (b); *United States v. Nicola*, 78 M.J. 223, 226 n.2 (C.A.A.F. 2019). Second, when evidence offered at trial "support[s] two different offenses, a Court of Criminal Appeals is not necessarily precluded from considering the evidence that was introduced in support of the charge for which the appellant was acquitted when conducting its Article 66(c), UCMJ, legal and factual sufficiency review of the charge for which the appellant was convicted." *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017). Therefore, we conclude evidence of Appellant's communications with "Jessica" were not only relevant to show he sought child pornography from her, but would also be available to demonstrate his intent with regard to "Febes" and "Jodie" in accordance with Mil. R. Evid. 404(b), and therefore properly informs our legal and factual sufficiency review. *Cf. United States v. Hyppolite*, 79 M.J. 161, 165–67 (C.A.A.F. 2019) (finding military judges did not abuse discretion in ruling that evidence of one charged offense could be used as evidence of common plan or scheme to commit other charged offenses under Mil. R. Evid. 404(b)).

[8] Specifications 1 and 3 alleged Appellant committed the offenses between on or about 17 August 2017 and on or about 18 August 2017; Specification 2 alleged Appellant committed the offense between on or about 16 August 2017 and on or about 18 August 2017.

Appellant's messages to the respective decoy, including the messages soliciting naked pictures from the decoys.

Specification 5 of the Charge alleged Appellant attempted to receive child pornography, specifically "photographs of what appear to be minors engaging in sexually explicit conduct," between on or about 16 August 2017 and on or about 18 August 2017.

Before trial, the Defense moved to dismiss Specification 5 as both multiplicious and an unreasonable multiplication of charges with Specifications 1, 2, and 3. The Government opposed the motion. Following Appellant's arraignment, the military judge conducted a hearing at which he heard arguments on the motion to dismiss. He subsequently orally announced his ruling and entered a written ruling into the record.

The military judge granted the defense motion in part and denied it in part. He found the charged attempted sexual abuse of a minor specifications and the attempted receipt of child pornography specification each required proof of elements the other offense did not, and were therefore not multiplicious. *See generally Roderick*, 62 M.J. at 431–32. With regard to unreasonable multiplication of charges, the military judge applied the five-part test the United States Court of Appeals for the Armed Forces (CAAF) articulated in *United States v. Quiroz*, 55 M.J. 334, 338 (C.A.A.F. 2001), and concluded that dismissal of Specification 5 was not warranted. However, he found "the specifications are unreasonably multiplied in the context of sentencing." Therefore, he ruled that if the court-martial returned a finding of guilty as to any of Specifications 1, 2, or 3, as well as Specification 5, he would instruct the court-martial to consider Specification 5 merged with attempted sexual abuse offense(s) and modify the maximum imposable punishment accordingly.

The court members found Appellant guilty of Specifications 1, 2, and 5. The military judge's sentencing instructions to the court members advised them: "At a previous hearing, I determined that for sentencing purposes, Specification 5 should be considered merged with Specifications 1 and 2." The Defense did not object to this instruction.[9]

---

[9] The military judge did not provide the court members with any further guidance on what "merged" meant in this context, or how the merger should be factored into the determination of an appropriate sentence. However, trial defense counsel told the military judge the Defense had no objection or request for additional instruction on this point. The CAAF has recently held that "affirmatively declin[ing] to object to the military judge's instructions" waives the objection on appeal. *United States v. Davis*,

*(Footnote continues on next page)*

**2. Law**

We review a military judge's denial of relief for claims of unreasonable multiplication of charges for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citations omitted). We also review a military judge's selection of a remedy for an abuse of discretion. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous.'" *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (quoting *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987)).

Rule for Courts-Martial 307(c)(4) provides in pertinent part: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The Government may not needlessly "pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994), *overruled on other grounds by United States v. Miller*, 67 M.J. 385, 388–89 (C.A.A.F. 2009); *see also* R.C.M. 906(b)(12). We consider the following non-exhaustive factors in determining whether unreasonable multiplication of charges has occurred:

> (1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?; (2) Is each charge and specification aimed at distinctly separate criminal acts?; (3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?; (4) Does the number of charges and specifications *unfairly* increase the appellant's punitive exposure?; and (5) Is there any

79 M.J. 329, 331–32 (C.A.A.F. 2020). In light of trial defense counsel's evident belief that the sentencing instructions were adequate, the CAAF's opinion in *Davis*, and Appellant's declination to assert on appeal that the sentencing instructions were erroneous, we find Appellant has waived any potential issue with the adequacy of the military judge's merger instruction, and we decline to disturb his waiver. *See generally United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018) (citation omitted) (explaining Courts of Criminal Appeals have discretion under Article 66, U.C.M.J., 10 U.S.C. § 866, to pierce waiver or forfeiture to correct a legal error).

> evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*Quiroz*, 55 M.J. at 338 (citation and internal quotation marks omitted).

### 3. Analysis

Appellant contends the military judge abused his discretion by merely merging Specification 5 with Specifications 1 and 2 for purposes of sentencing, and failing to dismiss Specification 5. We conclude the military judge reasonably applied the *Quiroz* factors and did not abuse his discretion.

The military judge found, and we agree, that the first two factors favored Appellant. The Defense made a timely pretrial objection that the specifications were unreasonably multiplied. Furthermore, the messages constituting Appellant's charged attempt to receive child pornography—his messages soliciting naked photographs from the decoys—are entirely captured in the specifications alleging the attempted sexual abuse by communicating indecent language. Thus, although the charged attempted receipt of child pornography is a separate crime from attempted sexual abuse of minors, it is rooted in the same criminal acts.

However, as to the third factor, we further agree with the military judge that Specifications 1, 2, 3, and 5, taken together, do not exaggerate or misrepresent Appellant's criminality. Specifications 1, 2, and 3 address Appellant's alleged lewd communications to each of the three decoys, and focus on the harm that Appellant's language might have been done to each "victim" had she been an actual child. Specification 5 addresses a distinct governmental interest in preventing a different harm, specifically the creation and proliferation of child pornography. *See United States v. Martens*, 59 M.J. 501, 504 (A.F. Ct. Crim. App. 2003) (quoting Pub. L. No. 104–208, Div. A, Title I, § 121, subsec. 1 (30 Sep. 1996) (noting Congress has found the elimination of child pornography provides a compelling government interest for prohibiting, *inter alia*, the distribution of child pornography). Moreover, as the military judge noted, the Government consolidated all of Appellant's alleged attempts to receive child pornography from each of the decoys into a single specification, mitigating the potential proliferation of specifications.

As to the fourth factor, the military judge found that, considering the extensive maximum imposable punishment Appellant faced if convicted for Specifications 1 through 4,[10] an additional ten years of potential confinement

---

[10] The military judge correctly determined Appellant faced a maximum term of 15 years of confinement for each of the attempted sexual abuse specifications, but incor-

*(Footnote continues on next page)*

for conviction for Specification 5 was not "*per se* unreasonable." However, he continued, considering that Specification 5 was "part of a short timeframe and is inextricably intertwined with the alleged indecent language charged in the first three specifications," the military judge found "the inclusion of Specification 5 for sentencing purposes unreasonably increased [Appellant's] punitive exposure."

As to the fifth factor, the military judge found "no evidence" of prosecutorial overreaching or abuse. Appellant suggests the inclusion of the term "child pornography" on the charge sheet "would evoke a visceral reaction from the members," despite the fact that the conduct alleged in the other four specifications was "objectively worse." Further, Appellant contends the Government already sought to "punish Appellant for his words" in Specifications 1, 2, and 3, and the inclusion of Specification 5 "greatly misrepresent[ed]" his criminality. However, as stated above in relation to the third factor, Specification 5 addressed a distinct crime that causes a separate harm than the other Specifications. We are not persuaded the Government was prohibited from addressing this distinct offense and separate harm in a separate specification, particularly where all of Appellant's attempts to receive child pornography were consolidated in a single specification.

We conclude the military judge did not abuse his discretion by declining to dismiss Specification 5 and by instead merging it with Specifications 1 and 2 for purposes of sentencing.

## C. Overt Act for Attempted Sexual Assault of a Child

Appellant raises two further challenges to his conviction for attempted sexual assault of a child. First, he argues the specification fails to state an offense because it did not specifically allege what overt act he took in furtherance of his attempt to sexually assault "Febes." By not identifying this overt act, Appellant argues the specification provided inadequate notice of what he needed to defend himself against.[11] Second, Appellant asserts the military judge erred by adding overt acts to the specification in the findings instructions he gave the members.

---

rectly concluded the attempted sexual assault carried a 30-year maximum term of confinement rather than 20 years. *See* Section III.E.1.b., *infra.* However, this error does not materially affect our analysis of unreasonable multiplication of charges.

[11] Appellant asserts that by omitting an overt act in the specification, he was only prepared to defend against actions taken "at or near Royal Air Force Mildenhall," which he argues would not include driving to Burton-on-Trent.

### 1. Additional Background

Specification 4 of the Charge alleged Appellant:

> did, at or near Royal Air Force Mildenhall, United Kingdom, on or about 18 August 2017, attempt to commit a sexual act upon "Febes," a person [Appellant] believed to be a child who had attained the age of 12 years, but not attained the age of 16 years, by causing penetration of "Febes'" vulva with his penis.

At the close of the Government's case, trial defense counsel moved for a finding of not guilty pursuant to R.C.M. 917. The Defense's argument was that the overt act charged by the Government was "by causing penetration of ['Febes's'] vulva with his penis," and—because there was no evidence of any such penetration—the Government failed to prove the overt act element required for a finding of guilty for attempt under Article 80, UCMJ. Trial counsel responded that the overt act was Appellant "arranging to meet 'Febes' a person whom [Appellant] believed to be a child under the age of 16, near the Stanhope Arms in Burton-on-Trent, and then driving his vehicle to the location to meet 'Febes.'" The military judge denied the defense motion, ruling that the Government was not required to specifically allege overt acts forming the predicate of an attempt and that the Government had put on evidence in support of the overt act proposed by trial counsel.

Over defense objection,[12] the military judge instructed the members that they could convict Appellant of Specification 4 only if the Government proved, *inter alia*:

> That, at or near Royal Air Force Mildenhall, United Kingdom, on or about 18 August 2017, [Appellant] did certain acts, that is: arranging to meet "Febes," a person that [Appellant] believed to be a child who had not attained the age of 16 years, near the Stanhope Arms in Burton-on-Trent and then driving to the Stanhope Arms to meet "Febes;" . . . .

### 2. Law

Whether a specification is defective is a question of law we review de novo. *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012) (citations omitted). A specification is sufficient if it fairly informs an accused of the offense he must defend against and enables the accused to "plead an acquittal or convic-

---

[12] Trial defense counsel explained their objection to the instructions was the same as that raised in their R.C.M. 917 motion, "that the language about certain acts . . . pertains to something that is different than what the Government charged."

tion in bar of future prosecutions for the same offense." *United States v. Norwood*, 71 M.J. 204, 206 (C.A.A.F. 2012) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). Attempts under Article 80, UCMJ, may be charged without specifically alleging the overt act in the specification. *United States v. Mobley*, 31 M.J. 273, 278 (C.M.A. 1990) (citation omitted).

Military judges have wide discretion in fashioning instructions, but those instructions must give the members "an accurate, complete, and intelligible statement of the law." *United States v. Behenna*, 71 M.J. 228, 232 (C.A.A.F. 2012) (citations omitted). We review military judges' instructions de novo. *United States v. Hale*, 78 M.J. 268, 274 (C.A.A.F. 2019) (citation omitted).

### 3. Analysis

We agree with Appellant that the attempted sexual assault specification did not allege any particular overt act. However, as our superior court held in *Mobley*, 31 M.J. at 278, and as we recently discussed in an unpublished opinion, *United States v. Allen*, No. ACM 39043, 2017 CCA LEXIS 649, at *13–19 (A.F. Ct. Crim. App. 11 Oct. 2017) (unpub. op.), an attempt specification need not allege a specific overt act. Appellant has cited no authority to the contrary. We see no indication in the record of trial that Appellant sought a bill of particulars from the Government. *See* R.C.M. 906(b)(6). We similarly discern no prejudice to Appellant and are not persuaded he was misled as to what he needed to defend against at trial.

Appellant was charged with attempting to sexually assault "Febes" by penetrating her vulva with his penis. He was also charged with attempting to sexually abuse her by communicating indecent language to her, which was proven in part through the introduction of messages between Appellant and "Febes" in which he made arrangements to meet her at a precise time and place coinciding with the time and place where he was later apprehended. As discussed above, the evidence indicates Appellant not only made these arrangements while he was at RAF Mildenhall, but left from the base to drive to Burton-on-Trent where he had arranged to meet "Febes." We perceive no credible argument that the omission of the overt act might have misled Appellant as to the alleged offense he was required to defend against.

Furthermore, the Government remedied any vagueness in the specification when it identified, and the military judge adopted, the overt acts of Appellant arranging to meet "Febes" and then driving to meet her. Doing so narrowed the offense, and the military judge then instructed the members that they not only had to find those overt acts beyond a reasonable doubt, but that Appellant took those acts with the specific intent to commit the offense of sexual assault of a child. Thus Appellant can precisely plead his conviction on these facts in order to bar any subsequent prosecution arising from the

same conduct. Despite Appellant's argument that the military judge relieved the Government of the burden of identifying the overt acts at the time Appellant was charged, we believe the more accurate view is that the military judge added an evidentiary burden at trial that the Government was required to meet. Had the military judge not specified any particular overt acts, the members would have been free to convict Appellant based upon a determination that Appellant did some overt act, the identification of which would be forever hidden behind the veil of the members' secret deliberations.

We conclude the military judge did not abuse his discretion in identifying the two overt acts here. Appellant's arranging to meet "Febes" and his subsequent travel to meet her were established by the evidence and a straightforward assessment of the evidence presented in the case. The military judge acted well within his discretion in identifying those overt acts as those which the Government had to prove in order to convict Appellant.

## D. Evidence of Intent

Appellant had arranged to meet "Jodie" several hours after he was supposed to meet "Febes." Evidence of this plan came from the messages between Appellant and "Jodie" admitted at trial along with the testimony of Ms. LM, "Jodie's" alter ego. The Defense did not object to this evidence during the Government's case in chief,[13] but it did object to trial counsel's proposed instruction that the evidence could be used to show "intent, plan, and absence of mistake" on Appellant's part. Trial defense counsel argued the evidence would be improperly used to show propensity, and not for any of trial counsel's stated purposes. The Defense, however, did not advance an alternative instruction or otherwise identify a desired remedy.

The military judge overruled the objection and instructed the members that they could consider "evidence that [Appellant] may have arranged to meet 'Jodie Walsh' for the limited purpose of its tendency, if any, to prove that [he] intended to engage in sexual acts with 'Febes.'" He further instructed the members they could not use the evidence for any other purpose, nor could they conclude from it that Appellant "is a bad person or has general criminal tendencies and that he therefore committed the offenses charged."

On appeal, Appellant argues the military judge's instruction that the members could only use this evidence to prove intent with respect to "Febes"

---

[13] Appellant did object to other messages between himself and "Jodie," but not to the messages arranging to meet with her.

"allowed the members to conclude that . . . he had a propensity to commit sexual assault of a child."

### 1. Law

Military judges have broad discretion when fashioning instructions. *Behenna*, 71 M.J. at 232 (citations omitted). In assessing whether an instruction was erroneous, we must determine whether the instruction sufficiently covered the issues in the case and whether, in the context of all the instructions given, the instruction "completed its purpose." *Id.* (citation omitted); *see United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (citation omitted). We will find an abuse of discretion when a military judge makes findings of fact not supported by the record, uses incorrect legal principles, or applies legal principles to the facts in a clearly unreasonable fashion. *Ellis*, 68 M.J. at 344 (citation omitted).

Under Mil. R. Evid. 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence may be admissible for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Extrinsic acts may be admitted for the purpose of proving an accused's intent to commit another offense. *United States v. Humpherys*, 57 M.J. 83, 91 (C.A.A.F. 2002) (citation omitted).

The failure to make a timely objection to evidence at trial forfeits that error in the absence of plain error. Mil. R. Evid. 103(a)(1)(A); *United States v. Knapp*, 73 M.J. 33, 36 (C.A.A.F. 2014) (citation omitted).

### 2. Analysis

We note at the outset that the evidence of Appellant arranging to meet "Jodie" was admitted without defense objection or request for a limiting instruction at the time. It was trial counsel who later asked for a limiting instruction on the use of the evidence after the close of findings, and trial defense counsel objected to the instruction. We cannot clearly discern from the record what remedy trial defense counsel sought at trial. We infer Appellant believes the military judge should have given a more restrictive instruction that prohibited the use of the evidence for the purpose of establishing Appellant's intent regarding "Febes," although the Defense did not propose such an instruction at trial and Appellant does not identify one on appeal.

Presuming Appellant's contention is that the military judge's instruction failed to adequately limit the use of the evidence that Appellant arranged to meet "Jodie," we conclude he has preserved the issue on appeal despite the ambiguous defense objection at trial. However, we further conclude the mili-

tary judge did not abuse his discretion by admitting the evidence or giving the limiting instruction.

In this case, the Appellant exchanged very similar messages with "Febes" and "Jodie" over a period of approximately 48 hours, and Appellant made arrangements to meet each of them the same night for the same illicit purpose. Evidence that Appellant sought to commit substantially the same offense with two different underage victims only hours apart, and did so over the same two-day period, is relevant and material evidence of his intent to carry out his plan to sexually assault "Febes." Had Appellant's communications with "Jodie" been removed in time from, or less similar to, his communications with "Febes," Appellant's complaint might have more force. Under these facts, however, evidence of Appellant's intent to meet up with "Jodie" for sex clearly suggests his intent to meet up with "Febes" earlier that evening for a similar purpose. The evidence was properly admissible under Mil. R. Evid. 404(b), and the military judge's decision to give a limiting instruction on this evidence was more than appropriate. *See United States v. Levitt*, 35 M.J. 114, 119 (C.M.A. 1992) (explaining the military judge has a duty to provide limiting instructions for uncharged misconduct admitted pursuant to Mil. R. Evid. 404(b) when requested by party) (citing Mil. R. Evid. 105) (additional citations omitted). Appellant argues the members might have improperly used the "Jodie" evidence to conclude Appellant had a propensity to commit similar offenses, but the military judge specifically instructed the members they were not permitted to reach that conclusion. We presume court members follow the military judge's instructions absent evidence to the contrary. *United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012) (citation omitted). We have no such evidence in this case, nor any basis to find prejudicial error.

**E. Sentencing Instructions**

Appellant asserts two errors with respect to the military judge's sentencing instructions. First, he argues the military judge erred by not instructing the members "on the nature and effect of the mandatory dishonorable discharge." Second, he notes the military judge incorrectly instructed the members, with the concurrence of both trial counsel and trial defense counsel, that the maximum sentence to confinement was 60 years, when in fact it was 50 years. Appellant requests this court set aside the sentence in his case.

**1. Additional Background**

**a. Mandatory Dishonorable Discharge**

In his sentencing instructions, the military judge advised the members:

> The law imposes a mandatory minimum sentence of a dishonorable discharge for the offense of attempted sexual assault of a child. Such a discharge deprives one of substantially all bene-

fits administered by the Department of Veterans Affairs and the Air Force establishment. A dishonorable discharge should be reserved for those who, in the opinion of the court, should be separated under conditions of dishonor after conviction of serious offenses of a civil or military nature warranting such severe punishment.

Prior to giving his instructions to the members, the military judge asked the parties whether they had any objections to the instructions or requested any additional instructions. Trial defense counsel answered, "No, Your Honor." Immediately after giving the instructions to the members, the military judge again asked whether the parties had any objections to the instructions or would like to request any additional instructions. Again, trial defense counsel answered, "No, Your Honor."

For the first time on appeal, Appellant argues the military judge should have included the following instruction drawn from the *Military Judges' Benchbook*:[14]

> You are advised that the stigma of a punitive discharge is commonly recognized by our society. A punitive discharge will place limitations on employment opportunities and will deny the accused other advantages which are enjoyed by one whose discharge characterization indicates that he has served honorably. A punitive discharge will affect an accused's future with regard to his legal rights, economic opportunities, and social acceptability.

#### b. Maximum Sentence

In computing the maximum imposable sentence to confinement, the military judge incorrectly determined the maximum confinement for attempted sexual assault of a child to be 30 years. Although the offense of sexual assault of a child is subject to a 30-year maximum, the attempted commission of the offense has a 20-year maximum.[15] As a result, the military judge overstated the maximum confinement for all convicted offenses as 60 years, when it was, in fact, 50 years.[16] Both trial counsel and trial defense counsel concurred with

---

[14] *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 84 (10 Sep. 2014).

[15] *MCM*, pt. IV, ¶ 4.e.

[16] The military judge merged the attempted receipt of child pornography offense with the attempted sexual abuse specifications for purposes of sentencing, resulting in a ten-year decrease in the overall maximum sentence to confinement.

the military judge's calculation. Trial counsel recommended a sentence of six years confinement, and the members sentenced Appellant to three years. On appeal, the Government concedes the computational error, but argues Appellant was not prejudiced.

### 2. Law

Under R.C.M. 920(f), the absence of an objection to a particular instruction or to the omission of an instruction prior to the members starting their deliberations forfeits the objection. *United States v. Davis*, 79 M.J. 329, 331 (C.A.A.F. 2020) (citations omitted). We review forfeited objections for plain error. *United States v. Tunstall*, 72 M.J. 191, 193 (C.A.A.F. 2013) (citation omitted). In order to prevail under the plain error standard, Appellant must establish "(1) error that is (2) clear or obvious and (3) results in material prejudice to his substantial rights." *United States v. McClour*, 76 M.J. 23, 25 (C.A.A.F. 2017) (quoting *Knapp*, 73 M.J. at 36).

However, when an appellant affirmatively declines to object to the military judge's instructions, the issue is waived. *Davis*, 79 M.J. at 331 (citations omitted). The CAAF cannot review waived issues, because affirmative waiver leaves no error to correct on appeal. *Id.* (citation omitted).

Pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c), the Courts of Criminal Appeals have the unique statutory responsibility to affirm only so much of the sentence that is correct and "should be approved." Thus, we retain the authority to address errors raised for the first time on appeal despite waiver of those errors at trial. *See, e.g., United States v. Hardy*, 77 M.J. 438, 442–43 (C.A.A.F. 2018).

Military judges are required to instruct members as to the maximum punishment which may be adjudged. R.C.M. 1005(e)(1).

### 3. Analysis

#### *a. Mandatory Dishonorable Discharge*

Under *Davis*, when trial defense counsel expressly stated they had no objections to the sentencing instructions, which included the mandatory dishonorable discharge instruction Appellant now challenges, Appellant waived this issue. We have considered whether we should grant relief under our Article 66(c), UCMJ, authority in spite of this waiver, and we decline to do so. The military judge's instruction highlighted the severity of a dishonorable discharge, that such a discharge should be reserved for those leaving the service "under conditions of dishonor," and that Appellant would lose "substantially all benefits." This instruction accurately captured the severity of a dishonorable discharge, and the military judge was not required to *sua sponte* give the instruction Appellant now requests.

### b. Maximum Sentence

We agree with the parties that the military judge erred in computing Appellant's maximum sentence by incorrectly finding the maximum confinement associated with an attempted sexual assault of a child to be 30 years instead of 20 years, leading to the members being instructed that Appellant was subject to a maximum period of confinement of 60 years, when the maximum confinement actually authorized was 50 years. However, the clear implication of *Davis* is that Appellant affirmatively waived this error as well. "By 'expressly and unequivocally acquiescing' to the military judge's instructions, Appellant waived all objections to the instructions, including in regards to the elements of the offense." *Davis*, 79 M.J. at 331 (quoting *United States v. Smith*, 2 C.M.A. 440, 442 (C.M.A. 1953)) (additional citation omitted). If an appellant may waive so fundamental a matter as the elements of the offense, we do not doubt the CAAF would also find he may waive an objection to the military judge's computation of the maximum punishment.

Again recognizing our authority under Article 66, UCMJ, to pierce waiver in order to correct a legal error, we again decline to do so. We do not discount the importance of the military judge providing the members correct instructions regarding the maximum imposable sentence, and the military judge clearly erred in this case. However, we doubt that instructing the members that Appellant could be sentenced to a maximum term of 50 years in confinement rather than 60 years in confinement would have materially affected the adjudged sentence. Both figures are vastly beyond both the six-year term trial counsel recommended and the three-year term the members imposed. Moreover, in either event, the offenses and evidence for which the members sentenced Appellant would be unchanged. We conclude this case does not call for piercing Appellant's waiver in order to remedy the legal error.

## F. SJAR Error

### 1. Law

"The proper completion of post-trial processing is a question of law the court reviews de novo." *United States v. Zegarrundo*, 77 M.J. 612, 613–14 (A.F. Ct. Crim. App. 2018) (citing *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)). Failure to comment in a timely manner on matters in or attached to the SJAR forfeits a later claim of error; we analyze such forfeited claims for plain error. *Id.* at 614 (citations omitted). "To prevail under a plain error analysis, Appellant must persuade this Court that: '(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (quoting *Kho*, 54 M.J. at 65) (additional citation omitted). "To meet this burden in the context of a [SJAR] error, whether that error is preserved or is

otherwise considered under the plain error doctrine, an appellant must make 'some colorable showing of possible prejudice.'" *Id*. at 436–37 (quoting *Kho*, 54 M.J. at 65).

### 2. Analysis

Although not raised by Appellant, we note the SJAR repeated the military judge's error with respect to the maximum imposable term of confinement, advising the convening authority that Appellant faced a maximum term of 60 years rather than 50 years. However, the Defense's clemency submission to the convening authority neither objected nor even commented on the military judge's erroneous instruction or the SJAR error. Reviewing for plain error, we find that the SJAR was obviously wrong; however, we find no colorable showing of possible prejudice. *See Scalo*, 60 M.J. at 436–37 (citation omitted). In some cases, we have found erroneous advice to the convening authority regarding the maximum punishment required a new post-trial process and action. *See, e.g.*, *United States v. Gooding*, No. ACM S32337, 2016 LEXIS CCA 766, at \*16–22 (A.F. Ct. Crim. App. 6 Dec. 2016). However, in this case, in the context of the entire sentencing and post-trial landscape, we are confident the error did not materially influence the convening authority's action. Among other considerations, we note the convening authority lacked the authority to modify Appellant's adjudged three-year term of confinement. *See* 10 U.S.C. § 860(c)(4)(a). Accordingly, we find no corrective action is warranted with respect to the SJAR error.

### G. Mr. GW's Criminal History

Appellant argues the attempted sexual abuse and attempted sexual assault specifications pertaining to "Febes" should be set aside because the Government did not turn over Mr. GW's criminal history in its possession. Alternatively, Appellant asks us to order a post-trial factfinding hearing.

### 1. Additional Background

Prior to arraignment, trial defense counsel requested via discovery "the results of a [United Kingdom] arrest/conviction records check of all members of Keeping Kids Safe who were present during the encounter with [Appellant] at the Stanhope Arms Hotel." Before trial, trial defense counsel interviewed Mr. GW, who said he had never been charged with or convicted of any offenses, only that he received a cease-and-desist order from a British constabulary.

On 9 May 2018, during the presentation of the Government's case in chief, British authorities sent the Air Force the results of background checks for four people believed to be involved with KKS, including a "Mr. GC-W." The email forwarding this information indicated British authorities believed Mr. GC-W was the same person as Mr. GW, who had testified for the Government earlier in the day as the person behind the "Febes" decoy. The back-

ground check showed Mr. GC-W had no convictions, reprimands, warnings, or cautions. Shortly after receiving this information, trial counsel turned it over to the Defense.

Later that same day, British authorities sent the Air Force a second email explaining that their records showed Mr. GC-W and Mr. GW had the same date of birth and may be the same person. The email went on to explain Mr. GC-W had been arrested in 2014 for an assault, but no action was taken. With respect to Mr. GW, the email said his last known address was in Burton-on-Trent and that he had been processed for common assault in 2014, and was arrested for breaching a non-molestation order in 2015. The email went on to explain no further action was taken in either case involving Mr. GW, and there was no recorded finding of guilt. Finally, the email noted, "it is probable that this person is synonymous with your subject [Mr. GW]." This email, however, was not turned over to the Defense during trial.

After the members announced their findings two days later, trial defense counsel told the military judge they still had not received information about the criminal backgrounds of three of the witnesses they had requested. Trial counsel asserted they "did turn over the response that came in to the legal office after that initial discovery which was turned over to the Defense and is an appellate exhibit; that there were no records on the remaining names that had not been contained in the initial document." Trial counsel continued:

> So, my understanding is that it has been turned over. However if it was not turned over the answer is that there were no records on those remaining three people. So, there was no kind of response at all in the system which is, in some of the records, there were names; and then it said no convictions, no warnings, no whatever. With the rest of them there is not even that kind of record . . . there was nothing on the remaining three individuals. I apologize if that did not get turned over to the Defense but there were no records on those remaining three people.

The military judge then moved on to the presentencing portion of trial.

About three months after the trial concluded, trial defense counsel asked trial counsel whether the Government had received any information about Ms. LM's criminal background. Only then did trial counsel turn over the email discussing the criminal background information for Mr. GW. In providing the email, trial counsel wrote, "There was no objection by Defense or request to review the exact source of the information" upon which trial counsel relied when they announced at trial: "there was nothing on the remaining three individuals." Trial counsel then added, "Nevertheless, in light of your

recent request and in the spirit of open discovery and disclosure, the Government is turning over the attached e-mail . . . ."

In response to Appellant's appeal, the Government concedes "it may have been prudent" to turn over the information sooner than it did, and "trial counsel were certainly wise to disclose the information out of an abundance of caution when requested," but the information is not inconsistent with Mr. GW's testimony, and therefore serves no exculpatory value.

**2. Law**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The United States Supreme Court has extended *Brady*, clarifying "that the duty to disclose such evidence is applicable even though there has been no request by the accused . . . and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see United States v. Claxton*, 76 M.J. 356, 359 (C.A.A.F. 2017).

"A military accused also has the right to obtain favorable evidence under Article 46, UCMJ . . . as implemented by R.C.M. 701–703." *United States v. Coleman*, 72 M.J. 184, 186–87 (C.A.A.F. 2013). Article 46 and these implementing rules provide a military accused statutory discovery rights that are greater than those afforded by the Constitution. *See id.* at 187; *United States v. Roberts*, 59 M.J. 323, 327 (C.A.A.F. 2004). In particular, R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to permit the inspection of, *inter alia*, any documents "within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." Information which is relevant to a witness's credibility may be "material to the preparation of the defense" for purposes of R.C.M. 701(a)(2)(A). *Roberts*, 59 M.J. at 326.

In addition, each party is entitled to the production of evidence which is relevant and necessary. R.C.M. 703(f)(1); *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Mil. R. Evid. 401. "Relevant evidence is 'necessary when it is not cumulative and when it would contribute to a party's presentation of the case in some positive way on a matter in issue.'" *Rodriguez*, 60 M.J. at 246 (quoting R.C.M. 703((f)(1) Discussion).

There are two categories of disclosure error: (1) cases in which the defense made no discovery request or merely a general request for discovery; and, (2) cases in which the defense specifically requested the information. *Coleman*,

72 M.J. at 187 (citing *Roberts*, 59 M.J. at 326–27). The harmless error standard of review—"whether there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"—applies to the first category. *Id.* (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (internal quotation marks omitted)). The heightened constitutional harmless beyond a reasonable doubt standard applies to the second category. *Id.* "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *Id.* (citation omitted).

In reviewing discovery matters, we conduct the following two-step analysis: "first, we determine whether the information or evidence at issue was subject to disclosure or discovery; second, if there was nondisclosure of such information, we test the effect of that nondisclosure on [Appellant's] trial." *Id.* (quoting *Roberts*, 59 M.J. at 325 (internal quotation marks omitted)).

### 3. Analysis

Appellant requested Mr. GW's criminal history. In spite of this request pertaining to a government witness, trial counsel failed to disclose responsive material in its possession. This was error. The error was compounded when trial counsel incorrectly told the military judge both that they had no such information and that the criminal records inquiry returned a negative response.

To be clear, it was not merely "prudent" for the Government to turn over this information; it was plainly required by R.C.M. 701 once the Government received it. Whatever the in-court admissibility of Mr. GW's criminal background, the Defense requested it, and the Defense was entitled to it insofar as it would inform the investigation they would pursue and the strategy they would have developed for defending Appellant at trial. In this case, the Defense sought to impugn the accuracy of the messages exchanged between Appellant and Mr. GW in his role as "Febes." This placed Mr. GW's credibility, motives, and biases squarely in issue for the Defense to investigate and prepare for trial, regardless of the admissibility of the information at trial. Although Mr. GW's criminal background came to the Government's attention mid-trial, the Defense might have made use of it; for example, trial defense counsel could have sought a continuance to investigate the matters, or asked the court to recall Mr. GW to the stand to question him about them.

Despite this discovery failure, Appellant is not entitled to relief if the nondisclosure was harmless beyond a reasonable doubt. *See Roberts*, 59 M.J. at 327 (citation omitted). We conclude that it was and no relief is warranted.

Although Mr. GW's role as a government witness for key charges put his credibility squarely in issue, neither his criminal history nor his statements

to trial defense counsel about his criminal background impugned his credibility in any significant way. In his interview with trial defense counsel, Mr. GW stated he had not been "charged with or convicted of" any crimes. Based on the background check information trial counsel eventually turned over, Mr. GW had not, in fact, been charged with or convicted of any offenses. The information indicated he had been arrested twice and "processed" once, but we see nothing that would render his statements to trial defense counsel false such that they could be used to attack his credibility at trial.

Because there is no evidence Mr. GW was convicted of a crime, Mil. R. Evid. 609 would not have enabled the Defense to impeach him with the arrests, the "processing," or any underlying offenses. Appellant contends the information might have been used to conduct further investigation that may have yielded evidence of a conviction that would be admissible under Mil. R. Evid. 609. This assertion, however, is highly speculative and Appellant has not brought forward any material information that Mr. GW's arrest record would have enabled him to discover. Without more, we do not see that Appellant's defense was prejudiced by the untimely discovery.

Testimony at trial effectively demonstrated that Mr. GW was a member of a self-selected group of citizens operating without recognition or indorsement at any level of British government. The primary import of his testimony, however, was to discuss his role as "Febes" and to authenticate and explain the messages he exchanged with Appellant, as well as to verify that Appellant had, in fact, shown up at the place he had arranged to meet "Febes." The messages they exchanged via WhatsApp were retrieved both from the phone Mr. GW was using and from Appellant's phone. The fact Appellant arranged to meet "Febes" was corroborated by Appellant's journey to Burton-on-Trent and his driving to the spot where he was to meet her.

We recognize that court members are likely to view an unorthodox organization like KKS with a fair degree of skepticism and to question the motives of its members, but significant other evidence strongly corroborated Mr. GW's testimony.[17] As a result, attacks on his credibility, especially unspecified attacks based on the possibility of a past conviction, would not have had any material impact on Appellant's trial.

---

[17] We note the members acquitted Appellant of all offenses pertaining to "Jessica Saunders," who was portrayed by Mr. JG, another KKS member. Because Appellant and "Jessica" only corresponded on Nearby, no corroborating messages were found on Appellant's phone. This suggests the members were only willing to convict when forensic evidence corroborated witness testimony.

We do not condone trial counsel's failure to disclose specifically-requested discovery regarding the credibility of a key government witness, but we are convinced this error was harmless beyond a reasonable doubt under the facts presented here, and no relief is warranted under Article 46, UCMJ, or *Brady*.

## H. Post-Trial Delay

Appellant was sentenced on 11 May 2018. The convening authority took action on 18 September 2018, 130 days later. Appellant's case was initially docketed with this court on 16 October 2018. Appellant filed his initial assignments of error on 14 May 2019 after requesting and receiving four enlargements of time. The Government filed its answer on 24 June 2019, and Appellant submitted a reply brief on 1 July 2019. This opinion is issued 18 months and 15 days after Appellant's case was initially docketed with this court.

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *Rodriguez*, 60 M.J. at 246; *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, CAAF established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of sentencing, and when the Court of Criminal Appeals does not render a decision within 18 months of docketing. 63 M.J. at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of his right to a timely review; and (4) prejudice to the appellant. *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice for purposes of an Appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) anxiety and concern; and (3) impairment of the appellant's ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted). In this case, we find no oppressive incarceration because Appellant's appeal has not resulted in any reduction in his term of confinement. Similarly, where the appeal does not result in a rehearing on findings or sentence, Appellant's ability to present a defense at a rehearing is not impaired. *Id.* at 140. As for anxiety and concern, the CAAF has explained "the

appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* We discern no such particularized anxiety in Appellant's case.

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. We do not find such egregious delays here. With regard to the delay in the convening authority's action, we note the Defense sought and was granted a delay in order to submit Appellant's clemency matters. Trial defense counsel submitted clemency matters 13 days after the original due date, which accounts for the presumptively unreasonable 10-day delay beyond the 120-day *Moreno* standard.[18]

With regard to appellate review, the delay in issuing the court's opinion exceeded the 18-month *Moreno* standard by 15 days. The record of trial is substantial, including over 900 pages of transcript and many exhibits. Moreover, Appellant has raised numerous issues, the careful consideration of which has resulted in a lengthy and split opinion from the court. On the whole, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *Id.*

Recognizing our authority under Article 66(c), UCMJ, we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

**I. Sentence Reassessment**

Based upon our decision to except the words "on divers occasions" from Specifications 1 and 2, the two specifications alleging attempted sexual abuse, we consider the reassessment of Appellant's sentence.

Under Article 59(a), UCMJ, 10 U.S.C. § 859(a), a court-martial sentence may not be held incorrect by virtue of legal error "unless the error materially prejudices the substantial rights of the accused." If we can conclude that an adjudged sentence would have been at least a certain severity, absent any error, "then a sentence of that severity or less will be free of the prejudicial

---

[18] Appellant's brief noted the delay between sentencing and action, but Appellant elected "not [to] raise this separately as an assignment of error."

effects of error; and the demands of Article 59(a) will be met." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986).

In deciding whether to reassess a sentence or return a case for a rehearing, we consider the totality of the circumstances, including the following factors: (1) "Dramatic changes in the penalty landscape and exposure;" (2) "Whether an appellant chose sentencing by members or a military judge alone;" (3) "Whether the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses and . . . whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses;" and (4) "Whether the remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial." *United States v. Winckelmann*, 73 M.J. 11, 15–16 (C.A.A.F. 2013) (citations omitted). We may only reassess a sentence if we "confidently can discern the extent of the error's effect on the sentencing authority's decision." *United States v. King*, 50 M.J. 686, 688 (A.F. Ct. Crim. App. 1999) (en banc) (quoting *United States v. Reed*, 33 M.J. 98, 99 (C.M.A. 1991)).

Based upon the principles set out above, we conclude we can reassess Appellant's sentence in light of the modifications to Specifications 1 and 2. Appellant remains convicted of the same offenses; the only modification is that the erroneous assertion that he sent the indecent communications to "Febes" and "Jodie" "on divers occasions" has been removed. The evidence supporting the offenses for which Appellant was convicted and sentenced has not changed. The maximum imposable sentence has not changed. We reassess Appellant's sentence, and conclude the court members would have imposed the same sentence had the error not occurred.

### III. CONCLUSION

The findings of guilty to Specifications 1 and 2 of the Charge are modified by excepting the words "on divers occasions." The excepted words are **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and the sentence, as reassessed, are **AFFIRMED**. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).


KEY, Judge (concurring in part and dissenting in part):

I agree with my esteemed colleagues in the majority with their resolution of the issues raised by Appellant with the exception of the holding that Appellant's conviction for attempted receipt of child pornography is legally and factually sufficient, which I respectfully dissent from.

Appellant indisputably asked for "naked" pictures, but just as indisputably, that is all he asked for. In my view, this is inadequate to support a conviction which required the Government to prove Appellant specifically intended to receive material which meets the legal definition of child pornography, and I would set aside Appellant's conviction for this offense.

The law of this land is that nudity, without more, is protected by the First Amendment to the United States Constitution.[1] *New York v. Ferber*, 458 U.S. 747, 765 n.18 (1982); *United States v. Moon*, 73 M.J. 382, 387 (C.A.A.F. 2014). In order to remove material from the protection of the First Amendment, the prohibited conduct must be "adequately defined" and "suitably limited and described" in the applicable statute. *Ferber*, 458 U.S. at 764. While the Government may prohibit child pornography without running afoul of the First Amendment, laws purporting to prohibit such material are invalid when they operate to prohibit a substantial amount of protected speech. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 256–58 (2002). Because of these principles, child pornography has been specifically defined in state and federal statutes, as well as the Uniform Code of Military Justice (UCMJ), with no small amount of litigation over the precise meaning of the terms contained within them. With this backdrop and the very real risk of encroaching upon constitutionally-protected free speech, we are obligated to precisely apply the relevant law and legal principles.

The Government's theory in this case was that Appellant sought to obtain images which depicted "actual or simulated lascivious exhibition of the genitals or pubic area of any person."[2] Assuming that an image contains a visual depiction of a child, the first step in determining whether the image is child pornography under the Government's theory here is to determine whether the genitals or pubic area of any person is exhibited. *See, e.g., United States v. Piolunek*, 72 M.J. 830, 836 (A.F. Ct. Crim. App. 2015), *aff'd* 74 M.J. 107 (C.A.A.F. 2015) ("If the images do not depict the genital or pubic area, we stop our analysis"); *United States v. Roderick*, 62 M.J. 425, 430 (C.A.A.F. 2006) (depiction of the genitals or pubic area is a prerequisite to further analysis).

Even when the genitals or pubic area is exhibited in an image, "this exhibition must be lascivious." *Piolunek*, 72 M.J. at 836 (quoting *United States v.*

---

[1] U.S. CONST. amend. I.

[2] Trial counsel asked the military judge to omit portions of the standard instructions on child pornography dealing with actual or simulated sexual intercourse, sodomy, bestiality, masturbation, sadistic or masochistic abuse.

*Horn*, 187 F.3d 781, 789 (8th Cir. 1999)). Mere nudity is inadequate to prove that an image is lascivious.[3] Without a lascivious exhibition, the conflation of pictures of nude children with illegal child pornography impermissibly criminalizes legal, if not constitutionally protected, material. *See, e.g., United States v. Moon*, 73 M.J. 382, 387 (C.A.A.F. 2014) (possession of images of nude minors that are neither obscene nor child pornography implicates the First Amendment's protections) (citing *United States v. Barberi*, 71 M.J. 127, 130–31 (C.A.A.F. 2012), *rev'd on other grounds*, *United States v. Piolunek*, 74 M.J. 107 (C.A.A.F. 2015)) (additional citations omitted).

In this case, Appellant asked for "naked" pictures without further elaboration. Unlike cases in which an accused has specifically requested photographs of a child's genitals[4] or depicting a child engaged in sexual acts such as masturbation,[5] Appellant made no request for images which would meet the legal definition of child pornography under the UCMJ, and none of the people he was messaging suggested they would send such images.

There are many ways to depict the nude human body, and a photograph of a naked child does not necessarily mean the child's genitals are visible at all, much less displayed in such a way as to amount to a "lascivious exhibition," as required by the law. An image which is less than obscene, or which does not include the exhibition of genitals or a pubic area, or which includes such exhibition which is not lascivious, fails to meet the definition of child pornography.

Appellant did not request any particular pose or vantage point or that the pictures include any of the girls' genital areas. He similarly did not ask for pictures to be composed of in such a way to render them "obscene," an additional criteria required due to the manner which Appellant was charged. The

---

[3] *See, e.g., United States v. Miller*, 940 F.3d 371, 376 (7th Cir. 2019); *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006); *United States v. Grimes*, 244 F.3d 375, 381–82 (5th Cir. 2001); *United States v. Amirault*, 173 F.3d 28, 33 (1st Cir. 1999); *United States v. Villard*, 885 F.2d 117, 124 (3rd Cir. 1989).

[4] *See, e.g., United States v. Jennings*, No. 201700241, 2019 CCA LEXIS 42, at *5 (N.M. Ct. Crim. App. 4 Feb. 2019) (unpub. op.), *rev. denied*, 79 M.J. 202 (C.A.A.F. 2019); *United States v. Johnston*, No. ACM 39075, 2017 CCA LEXIS 715, at *2 (A.F. Ct. Crim. App. 16 Nov. 2017) (unpub. op.), *rev. denied*, 77 M.J. 312 (C.A.A.F. 2018) (Appellant requested "sexy" pictures and a photograph of the vagina of a person he believed to be 14-years old).

[5] *See, e.g., United States v. Burmeister*, ARMY 20170065, 2018 CCA LEXIS 215, at *2 (A. Ct. Crim. App. 26 Apr. 2018) (unpub. op.) (per curiam), *rev. denied*, 78 M.J. 50 (C.A.A.F. 2018).

majority argues circumstantial evidence, such as Appellant's explicitly sexual nature conversations with the "girls" and his asking "Febes" if he could take naked pictures when he met her for the purpose of having sexual intercourse, permits the inference that the pictures he intended to receive with his requests for "naked pictures" were pictures containing a lascivious exhibition of the genitals or pubic area. I am unable to make that leap. The closest the evidence comes to suggesting Appellant sought a picture of anyone's genitals or pubic area is when he offered to show "Jessica" "a d*ck" if she would send him a naked picture.[6] Yet nowhere in his conversation with "Jessica" does Appellant suggest what should or should not be depicted in the picture he asked her to send, other than that it be "naked." Appellant's messages with the other two "girls" do not even go so far as the "d*ck" offer.

In one prior case, this court found a request for "nude pics" amounted to attempting to persuade, induce, entice, or coerce a minor to create child pornography. *United States v. Payne*, No. ACM 37594, 2013 CCA LEXIS 18 (A.F. Ct. Crim. App. 17 Jan. 2013) (unpub. op.), *aff'd*, 73 M.J. 19 (C.A.A.F. 2013). There, we determined Staff Sergeant (SSgt) Payne was seeking child pornography despite a generic request for "nude" pictures, in part because he had already sent the agent he was conversing with "photographs of his erect penis, as well as a video depiction of himself masturbating," which we concluded "provided . . . examples of the types of images he had in mind." 2013 CCA LEXIS 18 at *12. Sending a graphic video of a person masturbating along with pictures of an erect penis arguably provide greater context for the type of images SSgt Payne was seeking in return. Here, we have less, as Appellant sent no such pictures or videos. Our decision in *Payne* seems to have pushed the bounds of the concept of inferring specific intent to its outer limits, beyond which lies only speculation.

In the context of this case, where Appellant was having graphic conversations about sexual conduct with people held out to be young girls, Appellant's requests for naked pictures were validly included in the specifications alleging attempted sexual abuse. I cannot conclude, however, that Appellant's requests amounted to an attempt to receive child pornography in the absence of evidence he was seeking images that would meet the legal definition of that contraband material. Had Appellant been conversing with an actual child or perhaps a like-minded adult, it is entirely possible he would have received pictures qualifying as child pornography. He very well may have hoped to re-

---

[6] Notably, the members acquitted Appellant of the specification alleging he attempted to sexually abuse "Jessica" by communicating that language, and they purported to except "Jessica" out of the attempted receipt of child pornography specification.

ceive images that would so qualify, but there is simply no evidence this was the case. Without evidence Appellant specifically intended to obtain not just a picture of a nude child, but one that included both the lascivious exhibition of the genitals or pubic area *and* which was obscene, Appellant cannot be convicted of attempted receipt of child pornography.

Under these circumstances, even viewing the evidence in the light most favorable to the Prosecution, I would conclude no rational trier of fact could find the essential elements of this crime beyond a reasonable doubt. Similarly, I am unconvinced the Government proved this offense beyond a reasonable doubt. I would set aside Appellant's conviction of attempted receipt of child pornography as being both legally and factually insufficient.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court